1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

V.A.,

                           Plaintiff,

     v.

SAN PASQUAL VALLEY
UNIFIED SCHOOL DISTRICT, *et al.*,

                     Defendants.

Case No. 17-cv-02471-BAS-AGS

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

**[ECF No. 3]**

     Presently before the Court is Plaintiff V.A.'s Motion for Preliminary Injunction to enjoin Defendants San Pasqual Valley Unified School District, Board of Trustees of the San Pasqual Valley Unified School District, Monica Montague, Bernadine Swift Arrow, Rebecca Ramirez, Sally Ann Decorse, Lisa Aguerro, Rauna Fox, and Darrell Pechtl (collectively, "Defendants"). (ECF No. 3.) Previously, on December 12, 2017, the Court granted Plaintiff's request for a temporary restraining order ("TRO"). (ECF No. 6.) On December 19, 2017, the Court held a hearing on the motion for preliminary injunction. After considering the parties' arguments raised at

1  the hearing, and good cause appearing, the Court extended the TRO until the Court

2  resolved this motion for preliminary injunction. *See* Fed. R. Civ. Pro. 65(b)(2)

3  (permitting a court to extend a TRO for good cause). For the reasons stated below,

4  the Court **GRANTS** Plaintiff's motion for a preliminary injunction.

5

6  **I.    BACKGROUND**

7      **a.    Introduction and October 6, 2017 Incident**

8          Plaintiff is a high school senior at San Pasqual Valley High School ("School"),

9  who played or plays on the School's varsity football and basketball teams. (V.A.

10  Decl. ¶¶ 2, 5.) The School is a public school in the San Pasqual Valley Unified School

11  District ("District") and located in Winterhaven, CA. (Verdin Decl. ¶ 2.) During the

12  recent 2017 football season, Plaintiff began to silently kneel during the National

13  Anthem. (V.A. Decl. ¶¶ 7, 9, 15.) Plaintiff's decision to kneel was aimed at

14  expressing his "personal feelings and concern about racial injustice in our country."

15  (*Id.* ¶ 8.) He stated that he wanted to provide a reminder that "racial injustice in our

16  country" exists, "which we must not tolerate." (*Id.*) For the upcoming basketball

17  season and other sport seasons, Plaintiff intends to kneel during the National Anthem

18  when it is played. (*Id.* ¶ 32.)

19          At a home football game on September 29, 2017, Plaintiff kneeled during the

20  National Anthem, and did so peacefully and without incident. (V.A. Decl. ¶¶ 11-12.)

21  The following week, at an away game played in Mayer, AZ, Plaintiff kneeled again

22  during the National Anthem, and again did so peacefully. (*Id.* ¶ 16.) However, after

23  the game was played, a few students from Mayer High School approached some of

24  the School's students, made racial slurs, threatened to force Plaintiff to stand, and

25  sprayed a water bottle at the School's students, getting one cheerleader wet. (Adina

26  A. Decl. ¶¶ 16-18, 21.) In reaction to this incident, the School's principal, Defendant

27  Darrell Pechtl, spoke with Plaintiff's mother, and he expressed that he thought

28

Plaintiff's actions could be seen as "disrespectful" to the other school. (Pechtl Decl. ¶ 5; *see also* Adina A. Decl. ¶ 25.)

### b.   District's Initial Rules

Following the October 6, 2017 football game, the District's superintendent, Defendant Rauna Fox, states that she received feedback from community members, parents, and staff regarding how the District would address the Mayer High School students' behavior. (Fox Decl. ¶ 4.) She also received concerns regarding how the District would "ensure safety to staff and students" at the next football game. (*Id.*) The following actions then occurred:

(1) On October 11, 2017, Defendant Fox issued a memorandum to the District's coaching staff ("Initial Rules"), which stated:

> Students and coaches shall stand and remove hats/helmets and remain standing during the playing or singing of the National Anthem. Kneeling, sitting or similar forms of political protest are not permitted during athletic events at any home or away games. Violations may result in removal from the team and subsequent teams during the school year.

(Fox Decl. ¶ 6, Ex. 1; *see* V.A. Decl. at Ex. 1; Adina A. Decl. at Ex. 1.) Although Defendant Fox says these rules were meant to be "temporary," the memorandum stated that "[t]hese rules shall remain in effect until further notice, pending adoption of a Board Policy on this subject." (Fox Decl. ¶ 18, Ex. 1; *see also* V.A. Decl. at Ex. 1; Adina A. Decl. at Ex. 1.)

(2) The October 11, 2017 memorandum required all District coaches to hold a student-athlete meeting prior to their next game where the coaches would "explain and implement" the Initial Rules. (Fox Decl. at Ex. 1.) The student-athletes were required to sign an attendance sheet stating that they attended the meeting, or if they refused to sign, the coaches were instructed to write "refused to sign" by that student's name. (*Id.*)

(3) Plaintiff attended a meeting of the football team, led by the athletic director, on October 11, 2017 to discuss the new policy. (V.A. Decl. ¶¶ 24-26.) Plaintiff also signed the attendance sheet and was given a copy of the October 11, 2017 memorandum. (V.A. Decl. ¶¶ 25-26.)

(4) On October 12, 2017, Defendant Fox disseminated the Initial Rules in a letter to all of the District's students' parents, guardians, and caregivers. (Fox Decl. ¶ 8, Ex. 2.) This letter was also distributed at the School to all students. (V.A. Decl. ¶ 27.)

(5) The October 12, 2017 letter contained the same Initial Rules as in the October 11, 2017 memorandum, and again stated that "[t]hese rules shall remain in effect until further notice, pending adoption of a Board Policy on this subject." (Fox Decl. at Ex. 2; Verdin Decl. at Ex. 1.)

(6) The October 12, 2017 letter appears on the front page of the District's website under the "News" Section. (Verdin Decl. ¶ 3.) No other letter, memorandum, announcement, or other type of "news" appears on the District's website relating to the Initial Rules.

(7) Defendant Fox states that she "abandoned" the Initial Rules in lieu of dispensing with the playing of the National Anthem on October 12, 2017. However, Defendant Fox also states that she believed the "temporary rules [or the Initial Rules] were . . . in effect until the Board had a chance to consider adopting a formal policy" on November 28, 2017. (Fox Decl. ¶ 10.) Defendant Fox also does not provide by what method or procedure the Initial Rules were abandoned upon the District's Board of Trustees' ("Board") consideration of the Initial Rules.

(8) Nothing appears on the District's website stating the Initial Rules were abandoned.

(9) No letter or memorandum retracting the Initial Rules was sent to the District's coaching staff, students, or students' parents, guardians, or caregivers.

17cv2471

(10) No meeting was required or held to explain to the student-athletes that the Initial Rules were abandoned or no longer enforced. The student-athletes were not required to sign any form or other sheet stating that they were informed of the Initial Rules' abandonment or non-enforcement.

(11) On November 28, 2017, believing the Initial Rules were in effect, Plaintiff attended an away basketball game where the National Anthem was played before the game. Plaintiff left the basketball court when the National Anthem began playing, and waited outside. (V.A. Decl. ¶ 35.)

(12) At the November 28, 2017 Board meeting, the Board voted to table a policy relating to the Initial Rules, but no policy was adopted nor were the Initial Rules discussed or revoked. On December 12, 2017, the Board did not discuss either policy at their meeting.

Thus, without clear evidence showing otherwise, it appears that the Initial Rules continue to be in effect and enforceable at this time. (*See* Fox Decl. at Ex. 1 (stating that the Initial Rules "shall remain in effect until further notice, pending adoption of a Board Policy on this subject").)

c.    **District's Draft Policy**

Following the October 11, 2017 memorandum and October 12, 2017 letter, the Board asked Defendants' counsel, who also serves as the District's general counsel, to draft a facilities use policy to "exclude[] any type of political activism or protesting" ("Draft Policy"). (Thurbon Decl. ¶ 5.) The Draft Policy states, in short:

> Students and staff members participating in extracurricular programs and interscholastic activities may not engage in political activism [including but not limited to kneeling, sitting, or other forms of political protest during the playing or singing of the National Anthem] during the time reserved for such events. Students or staff members engaging in political activities including peaceful political protest during the time reserved for these events are subject to removal from the event and facility and may be denied participation

17cv2471

in future extracurricular activities and interscholastic athletic competitions, events and practices.

(*Id.* at Ex. 1.) The Draft Policy remains a draft and has not been adopted as District policy. (*See* Fox Decl. ¶¶ 14-15, Ex. 4.) At the preliminary injunction hearing, Defendants' counsel stated that he has created other drafts of this policy and suggested that this version of the Draft Policy is no longer current.

While the Initial Rules were not addressed at the Board meeting on November 28, 2017, the Draft Policy was discussed. (Fox Decl. at Ex. 4). At this meeting, many community members raised questions and concerns about adopting the Draft Policy. The Board neither adopted nor rejected the Draft Policy, but instead voted to table the Draft Policy "for potential consideration at a future board meeting." (*Id.* (tabling the Draft Policy "until next month"); Thurbon Decl. ¶ 7.)

At the next Board meeting, on December 12, 2017, the Board did not adopt, reject, or discuss the Draft Policy, though the Draft Policy was placed on the meeting's agenda. (Thurbon Decl. ¶ 7.) The Draft Policy currently is "an item that might subsequently be added to an agenda at some point in the future." (*Id.*) Defendants' counsel has not been asked to proceed with work on the Draft Policy, but he was asked to review and provide feedback from research on and evaluation of questions raised by the public. (*Id.*)

### d.     Playing of the National Anthem

To avoid facing the issue of kneeling during the National Anthem all together, Defendant Fox recommended that the School not play the National Anthem at the final football game on October 12, 2017. (Fox Decl. ¶ 10.) As a result, the National Anthem was not played at that game. (*Id.* ¶ 11.) Defendant Fox states that the District does not play the National Anthem at home basketball games. (Fox Decl. ¶ 10.) However, at the preliminary injunction hearing, Defendants' counsel stated that the District has no control over whether the National Anthem is played at away

17cv2471

1  basketball games. As stated above, the National Anthem was played at the November

2  28, 2017 basketball game. (V.A. Decl. ¶¶ 35-37.) Additionally, Plaintiff's counsel

3  stated at the preliminary injunction hearing that the National Anthem was also played

4  at the December 12, 2017 basketball game.

5      It is also unclear whether the National Anthem is played at other sports games,

6  such as baseball games or track meets. (*See* V.A. Decl. ¶ 6 (stating Plaintiff also plans

7  to participate in baseball and track).) Plaintiff intends to kneel during the National

8  Anthem when it is played. (*Id.* ¶ 32.)

9

10  **II.   DISCUSSION**

11      **1.   Legal Standard for Preliminary Injunction**

12      A plaintiff seeking a preliminary injunction must establish: (1) "that he is

13  likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the

14  absence of preliminary relief," (3) "that the balance of equities tips in his favor," and

15  (4) "that an injunction is in the public interest." *Am. Trucking Ass'ns Inc. v. City of*

16  *Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res.*

17  *Defense Council, Inc.*, 555 U.S. 7, 21 (2008)). "[C]ase law clearly favors granting

18  preliminary injunctions to a plaintiff . . . who is likely to succeed on the merits of his

19  First Amendment claim." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th

20  Cir. 2009).

21

22      **2.   Likelihood of Success on the Merits**

23      The Court finds that Plaintiff is likely to succeed on the merits because, under

24  *Tinker*, a school cannot limit a student's right to free speech if it is unlikely to

25  substantially disrupt the school's activities or learning or interfere with other

26  students' rights. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503,

27  513-14 (1969); *see also W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642

28  (1943) ("[T]he action of the local authorities in compelling the flag salute and pledge

1  transcends constitutional limitations on their power and invades the sphere of
2  intellect and spirit which it is the purpose of the First Amendment to our Constitution
3  to reserve from all official control.").

4     Though schools may regulate students' speech in some limited circumstances,
5  public school students do not "shed their constitutional rights to freedom of speech
6  or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506. In other words,
7  students "cannot be punished merely for expressing their personal views on the
8  school premises—whether 'in the cafeteria, or on the playing field, or on the campus
9  during the authorized hours.'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267
10  (1988) (quoting *Tinker*, 393 U.S. at 512-13). Courts have a long (and unequivocal)
11  history of siding with students over schools when faced with similar restrictions,
12  finding that schools cannot force students into patriotic expression under the threat
13  of retaliation. *See, e.g., Barnette*, 319 U.S. at 642; *Holloman ex rel. Holloman v.
14  Harland*, 370 F.3d 1252, 1268-69 (11th Cir. 2008); *Sherman v. Cmty. Consol. Sch.
15  Dist. 21*, 980 F.2d 437, 442 (7th Cir. 1992); *Lipp v. Morris*, 579 F.2d 834, 836 (3d
16  Cir. 1978); *Goetz v. Ansell*, 477 F.2d 636, 637-39 (2d Cir. 1973).

17
18          **a.      Kneeling is Speech**

19     It is well settled that certain actions, though not spoken, are considered speech
20  and protected by the First Amendment. *See Barnette*, 319 U.S. at 633 ("Symbolism
21  is a primitive but effective way of communicating ideas.") This is especially true
22  when these actions involve other patriotic acts. *Id.* at 632 ("There is no doubt that, in
23  connection with the pledges, the flag salute is a form of utterance.").

24     The Court finds that Plaintiff's kneeling during the National Anthem is speech.
25  This action is closely linked to the similar, well-known protests performed
26  throughout the country, started by former National Football League quarterback
27  Colin Kaepernick. (*See* ECF No. 3 at 8 n.1.) It is clear to the Court that by kneeling,
28  rather than standing, during the playing or singing of the National Anthem Plaintiff

17cv2471

is expressing a similar protest to "racial injustice in our country." (V.A. Decl. ¶¶ 7-8.) Plaintiff also states that he intended to express this opinion. (*Id.*)

### b.    Legal Standard Under *Tinker* Applies

"The schoolroom prepares children for citizenship, and the proper exercise of the First Amendment is a hallmark of citizenship in our country." *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 527 (9th Cir. 1992). But this practice of citizenship is not without its limitations. While schools prepare students for adult experiences, a school is not required to ensure a full adult experience while on campus, especially if such experiences would interfere with the school's "basic educational mission." *See id.* (quoting *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 685 (1986)). Thus, courts have found that "the determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board," rather than with the judiciary. *Fraser*, 478 U.S. at 683. Because school officials have a better sense than courts of how to best monitor this speech, a school can permissibly regulate three categories of speech with varying standards:

> (1) vulgar, lewd, obscene and plainly offensive speech is governed by *Bethel School District v. Fraser*, 478 U.S. 675 . . . (1986);
> (2)    school-sponsored    speech    is    governed    by *Hazelwood*; and
> (3) speech that falls into neither of these categories is governed by *Tinker*.

*Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 765 (9th Cir. 2006).

It is clear that Plaintiff's actions are not "vulgar, lewd, obscene, [or] plainly offensive" speech, nor is Plaintiff's silent kneeling during the National Anthem at a sports game "school-sponsored speech."[1] *Cf. Fraser*, 478 U.S. at 682 (finding a

---

[1] At the preliminary injunction hearing, Defendants' counsel seemed to suggest that the standard in *Hazelwood* applies. For the reasons explained in this Order, while the Court does not dispute that schools can regulate some student speech, the policy at issue does not relate to school-sponsored speech, and rather *Tinker*'s standard

– 9 –

speech at an official school assembly containing an "elaborate, graphic, and explicit sexual metaphor" was offensive speech); *Hazelwood*, 484 U.S. at 272-73 (holding that a school newspaper produced in a journalism class taught by a faculty member during regular class hours and where the students received grades was school-sponsored speech). Instead, Plaintiff's quiet protest at an extracurricular activity falls within the speech governed by *Tinker*. *See, e.g., Pinard*, 467 F.3d at 765 (applying the standard in *Tinker* to a petition that members of the basketball team wrote criticizing their coach); *Chandler*, 978 F.2d at 527 (applying *Tinker* when students expressed support for a teachers' strike by wearing buttons); *see also Hazelwood*, 484 U.S. at 271 (distinguishing between "a student's personal expression that happens to occur on the school premises" and an "educators' authority over school-sponsored [activities] that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school"). A school has less of an interest (and receives less deference) when restricting a student's speech that expresses the student's personal opinion, rather than when the student's opinion is blended in and interpreted as being that of the school's. *Cf. Chandler*, 978 F.2d at 529 (citing to *Hazelwood*, 484 U.S. at 271, 273) ("[F]ederal courts are to defer to a school's decision . . . to 'disassociate itself' from speech that a reasonable person would view as bearing the imprimatur of the school.").

Here, even though his actions occur during a school sanctioned activity, Plaintiff's kneeling during the National Anthem is easily interpreted and distinguished as his own expression, and not that bearing the school's imprimatur. *Tinker*, 393 U.S. at 508-09 (finding similarly that students wearing black armbands during school hours did not constitute school-sponsored speech); *Chandler*, 978 F.2d at 530 ("The buttons [worn by students] expressed the personal opinion of the students wearing them, and they were displayed in a manner commonly used to

---

applies. Based on the record, the distinction of a "public" verses "non-public" forum is not at issue here.

convey silently an idea, message, or political opinion to the community."). By silently kneeling on the sideline, Plaintiff's protest to racial injustice sends a personal message to the community that is akin to an individual student's display of a button or an armband during school hours. The expression is easily interpreted as his own, rather than the school's, much like Colin Kaepernick's expression is interpreted as his own, and not imputed to the San Francisco 49ers. Moreover, Plaintiff's kneeling in protest during the National Anthem expresses an opinion that is opposed to the school's decision to play the National Anthem with the expectation that students will stand. *See Chandler*, 978 F.2d at 530 (stating that students' "scab" buttons could easily be seen as "diametrically opposed" to the school district's decision to hire temporary teachers during a strike). The record shows that any reasonable person would interpret Plaintiff's expression as being separate and apart from the School's opinion. Accordingly, the Court analyzes the Initial Rules under *Tinker*.

### c. No "Likelihood of Substantial Disruption" or Interference with Other Students' Rights

In *Tinker*, the Supreme Court found that a school can regulate students' speech if the school shows "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities" or interference "with the rights of other students to be secure and to be let alone." 393 U.S. at 512-14. Even so, the Supreme Court found that students wearing black armbands to protest the Vietnam War "was a silent, passive expression of opinion, unaccompanied by any disorder or disturbance" that "neither interrupted school activities nor sought to intrude in the school affairs or the lives of others." *Id.* at 508, 514 ("Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk . . . ."). Thus, the First Amendment protected the students' expression and prohibited school officials from regulating this form of expression. *Compare id.*, *and Chandler*, 978 F.2d at 530 (rejecting school's

argument that students wearing buttons that said "scab" to express their support of a teachers' strike were inherently disruptive), *with Taylor v. Boswell Indep. Sch. Dist.*, 713 F.3d 25, 35 (10th Cir. 2013) (holding school officials could regulate students' free speech rights to prevent them from distributing rubber fetus dolls after a distribution of 2,500 dolls resulted in various "doll-related disruptions").

Plaintiff's silent kneeling during the National Anthem is not likely to cause a "substantial disruption of or material interference with school activities" or interfere with other students' safety. [2] *Tinker*, 393 U.S. at 514. When Plaintiff first knelt, he did so peacefully and without incident. (V.A. Decl. ¶ 12.) Plaintiff also knelt peacefully at the second football game. (*Id.* ¶ 16.) It was only hours following Plaintiff's protest, and after the football game, that students from a different school made racial slurs and threw water at a few of the School's students. (Adina A. Decl. ¶¶ 14-16, 18, 21.) Even so, this incident does not rise to a "substantial disruption of or material interference with school activities," nor does it interfere with the students' safety. *Tinker*, 393 U.S. at 508 (finding that "a few students made hostile remarks to the children wearing armbands, but there were no threats or acts of violence on school premises"). The football game was played as scheduled and, while the Court does not minimize the impact of racial slurs and threats, the threats were minimal and did not lead to any physical violence. (*See* Adina A. Decl. ¶¶ 14-22.) The students' threats were to "force" Plaintiff to stand, and the only action taken was water being tossed from a water bottle, getting one student wet. (*Id.*) The School's principal confirmed that there was no evidence of a fight during or after the game. (Pechtl Decl. ¶ 4.) Additionally, the likelihood of this incident happening again is reduced because the

---

[2] This interpretation is bolstered by looking at the Draft Policy which states that "[s]tudents or staff members engaging in political activities *including peaceful political protest* during the time reserved for these events are subject to" discipline. (Thurbon Decl. at Ex. 1 (emphasis added).) It appears the intent of the Initial Rules is to include peaceful protests whether or not they result in disturbances.

17cv2471

1  School requested that Mayer High School be removed from its upcoming football
2  schedule.

3      The Court finds that, when applying *Tinker*, Plaintiff is likely to succeed on
4  the merits because the Initial Rules, as well as the proposed Draft Policy, are aimed
5  at regulating students' speech that is unlikely to cause a substantial disruption of or
6  material interference with school activities or interfere with other students' rights.

7

8      **3.    Irreparable Harm**

9      "[T]he loss of First Amendment freedoms, for even minimal periods of time,
10  unquestionably constitutes irreparable injury." *Associated Press v. Otter*, 682 F.3d
11  821, 826 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Thus,
12  a "colorable First Amendment claim is irreparable injury sufficient to merit the grant
13  of [preliminary injunctive] relief." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014).
14  Additionally, a "request for injunctive relief remains live only so long as there is
15  some present harm left to enjoin." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853,
16  864 (9th Cir. 2017) (quoting *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1502
17  (D.C. Cir. 1995)). In other words, a request for injunctive relief is not moot if the
18  conduct alleged to have caused the irreparable harm is "reasonably expected to
19  recur." *See Ruiz v. Santa Maria*, 160 F.3d 543, 549 (9th Cir. 1998).

20      The Court finds that both the Initial Rules currently in effect and the Draft
21  Policy currently being considered by the District would cause Plaintiff irreparable
22  harm. Defendants make three arguments to refute this. First, they state that the Initial
23  Rules were never enforced or were abandoned. Second, they argue that the Draft
24  Policy is not enforceable and will never be adopted. Third, they claim that the
25  National Anthem will not be played during basketball games. The Court is
26  unpersuaded by these arguments.

27      First, the record does not support Defendants' argument that Defendant Fox
28  abandoned the Initial Rules. (ECF No. 8 at 13). The record is void of any evidence,

other than Defendant Fox's own contradictory statements, that she abandoned this policy on October 12, 2017. The Initial Rules state that the rules "remain in effect *until further notice*, pending *adoption* of a Board Policy on this subject." (Fox Decl. at Ex. 1 (emphasis added); *see also* V.A. Decl. at Ex. 1; Adina A. Decl. at Ex. 1.) No notice was ever given, nor did the Board adopt a different Board policy. No letter announcing the abandonment of this policy was sent to the staff, students, or students' caregivers, guardians, or parents. No meeting was held to tell the students that the Initial Rules were abandoned, nor were the student-athletes required to sign a sheet stating that they were told the rules were abandoned. No notice was posted on the District's website, nor was the letter announcing the policy removed from the District's website. Moreover, Plaintiff and another student clearly believed the policy was in effect on November 28, 2017 because they both left the basketball court while the National Anthem played before the start of the basketball game. (V.A. Decl. ¶¶ 35-36.)

At the preliminary injunction hearing, Defendants' counsel stated that the Initial Rules were abandoned and not in effect as of October 12, 2017, but he was also unable to point to any piece of evidence confirming this statement.[3] Additionally, Defendants' counsel's October 28, 2017 letter seems to suggest the contrary. (*See* Verdin Decl. at Ex. 4.) Moreover, at no point over the last two months did Defendants or Defendants' counsel communicate to Plaintiff or Plaintiff's counsel that the Initial Rules were abandoned. Defendants' counsel had multiple chances to provide this information in response to Plaintiff's counsel's letters from October 12, October 19, November 20, and December 7. (Verdin Decl. at Exs. 2, 3, 5, 6 (requesting the

---

[3] While the Court considers Defendants' counsel's statements as an officer of the court, it cannot accept these statements as fact when the evidence presented in this case shows the contrary. *See Spradlin v. Lear Siegler Mgmt. Servs. Co.*, 926 F.2d 865, 869 ("Argument by counsel serves only to elucidate the legal principles and their application to the facts at hand; it cannot create the factual predicate.").

District rescind or retract its previous memorandum and provide notice of this action).) Instead, at the preliminary injunction hearing, Plaintiff's counsel stated that they only first learned that the Initial Rules were "abandoned" on December 18, 2017 when Defendants filed their opposition to Plaintiff's motion for preliminary injunction.

Additionally, the Board failed to adopt a policy that would supersede the Initial Rules. Defendants argue that the Board's declining to adopt the Draft Policy "effectively vacated" the Initial Rules (ECF No. 8 at 13), but again, Defendants fail to provide support to substantiate this procedure. With Plaintiff's First Amendment rights at issue, the Court is unwilling to accept "effectively vacating" the Initial Rules over actually vacating the policy. Without a clear record stating that the Initial Rules are no longer in effect, the Court finds that Plaintiff will be irreparably harmed by its enforcement.

Second, Defendants argue that the Board will never adopt the Draft Policy, but again, the record does not support this finding. Nowhere in the record do Defendants state that the Draft Policy has been rejected or that it will never be considered by the Board. At the preliminary injunction hearing, Defendants' counsel represented that the Board does not plan to adopt this or any version of the Draft Policy in the next six months. However, counsel could not point to any evidence on the record to support this representation. Instead, the record shows that the Board only "declined to adopt" the Draft Policy at the two most recent Board meetings and that the Draft Policy remains as an item on the Board's agenda "for potential consideration." (Thurbon Decl. ¶ 7 (stating that the Board "tabled [the Draft Policy] for potential consideration at a future board meeting" and that it remains "an item that might be added to an agenda at some point in the future")).) It also appears that the Board is continuing to consider the Draft Policy because it continues to accept and evaluate the public's questions and opinions regarding the Draft Policy. (*Id.*) Nothing is

preventing the Board from calling a special meeting (as it did in November) and adopting the Draft Policy.

Third, Defendants state repeatedly that the National Anthem is not played at home basketball games, but do not guarantee that the National Anthem will not be played at away basketball games. In fact, Plaintiff stated that the National Anthem was played during an away basketball game on November 28, 2017 (V.A. Decl. ¶¶ 35-37), and Plaintiff's counsel stated at the preliminary injunction hearing that it was played at the December 12, 2017 basketball game. While the National Anthem may not be played at the District's home games, this statement does not cover all the basketball games that Plaintiff may attend nor does it apply to the upcoming sports seasons or graduation. The Initial Rules apply explicitly to "any home or away games" (Adina A. Decl. at Ex. 1), and the Draft Policy would apply to all extracurricular activities, potentially including graduation. (Fox. Decl. ¶ 10 (stating that the National Anthem is played during graduation).)

The Court finds that Plaintiff is likely to suffer irreparable harm without injunctive relief because the Initial Rules are currently in force, the Draft Policy is under consideration, and one or both of the policies may be enforced, which would violate Plaintiff's First Amendment rights.

### 4. Balance of Equities and Public Interest

The balance of equities and public interest tip in Plaintiff's favor. By Defendants' own argument, they face no risk of harm because the District does not anticipate playing the National Anthem at District-hosted basketball games. On the other hand, Plaintiff faces a great risk of harm to his First Amendment rights if his rights are infringed at even one sporting event.

Finally, the Ninth Circuit "consistently recognize[s] the significant public interest in upholding free speech principles." *Klein*, 584 F.3d at 1208 (finding

17cv2471

"balance of equities and the public interest thus tip sharply in favor of enjoining"). The Court likewise finds that this public interest is present here.

### 5.    Bond

As it did in the TRO, the Court dispenses the requirement for a bond at this time because it does not appear that the preliminary injunction is likely to harm Defendants. *See Gorbach v. Reno,* 219 F.3d 1087, 1092 (9th Cir. 2000) (finding no evidence that defendants would suffer damages from a preliminary injunction); *IBiz, LLC v. City of Hayward*, 962 F. Supp. 2d 1159, 1171 (N.D. Cal. 2013) (holding that no bond is required when considering First Amendment claims). Additionally, Defendants have not objected to this determination nor have they argued that they will be harmed.

## III.    CONCLUSION

For the reasons stated below, the Court **GRANTS** Plaintiff's motion for a preliminary injunction.

Accordingly, the Court **ENJOINS** Defendants, serving in their official capacities, as well as Defendants' officers, agents, servants, employees, and attorneys, from enforcing the District's Initial Rules and/or temporary requirements on National Anthem political protests as stated in its October 11, 2017 memorandum and October 12, 2017 letter from Superintendent Rauna Fox; the District's Draft Policy (BP 1330.2), currently titled "Use of Facilities or Grounds for Political Activities"; or any other similar policy that would:

> (a) restrict Plaintiff's or other students from kneeling or sitting during the playing or singing of the National Anthem at extracurricular events, including athletic events; or

17cv2471

1           (b) require any action from Plaintiff or other students during the

2           playing or singing of the National Anthem at extracurricular

3           events, including athletic events;

4   effective immediately until this matter is resolved by this Court.

5         Additionally, the Court **ORDERS** Plaintiff to serve Defendants with

6   this Order as soon as practical, but <u>**no later than 12:00 p.m. on Friday,**</u>

7   <u>**December 22, 2017**</u>.

8         **IT IS SO ORDERED.**

9

10  **DATED:  December 21, 2017**

11  Hon. Cynthia Bashant

12  United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17cv2471